**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JANUARY 17, 2001**

*In re* HONORABLE WILLIAM J. RUNCO,

No. 116565

_____

PER CURIAM

The Judicial Tenure Commission has asked this Court to enter a public censure of 19th (Dearborn) District Judge William J. Runco. We accept the recommendation of the commission, and we enter this opinion, which will stand as our censure.

I

Our review of this matter is de novo. *In re Ferrara*, 458 Mich 350, 358; 582 NW2d 817 (1998). Having examined the record and considered the arguments of the parties, we adopt the following facts, as found by the commission:[1]

> Gerald and Ilene Trifan were the owners of a bowling alley in Melvindale, Michigan, which they had acquired for $60,000 in 1984. Respondent Runco

---

[1] As its findings of fact, the commission adopted the facts found by the master. Thus, the quoted material was authored by the master.

did the legal work for the Trifans in the purchase of the property. The building became damaged and condemned by the City of Melvindale in 1986. The Trifans could not afford to remove it, therefore, the City removed it and filed a lien against the property for the cost of the removal. As of November 1986, the liens against the property were approximately $36,000.

The Trifans were interested in purchasing a bowling alley in Allen Park, Michigan, since their building had been destroyed, and were negotiating for its purchase in 1986. Mr. Trifan engaged Respondent Runco regarding this purchase. The Trifans had limited resources as a result of the closing of the Melvindale bowling alley, their sole source of income at that time, and needed money from the sale of that property in order to purchase the Allen Park bowling alley.

The Trifans had listed the Melvindale property for sale with a multiple listing service for $49,000. Little Caesar's restaurant chain made a written offer of $49,500, $500 more than the listing agreement price. Mr. Trifan brought this offer to Respondent Runco and asked him to review the terms of the purchase.

Respondent Runco advised Mr. Trifan of contingencies in the Little Caesar's offer. He suggested that there were so many contingencies that the purchaser would be able to back out without completing the sale. He then told Mr. Trifan that he had a friend, Raymond Trudeau, who had developed various properties in the area, and that he might be interested in the Melvindale property. Respondent Runco was aware that Trudeau had developed a Meineke Muffler Shop on similar property that he owned in Lincoln Park. Respondent Runco obtained Mr. Trifan's permission to discuss the property with Trudeau. The property now consisted of seven vacant lots. Respondent Runco did not suggest or recommend that the Trifans either make a counteroffer to Little Caesar's or negotiate to remove some of the unacceptable contingencies. Instead, he brought the property to Mr. Trudeau's attention.

In the first conversations with Trudeau, Respondent Runco indicated that he would like to be part of the developments Trudeau was working on. He indicated his interest in becoming a partner in the development of the Trifan's Melvindale

2

property. During the course of these conversations and before the purchase of the Trifan's property, it was agreed between Trudeau and Respondent Runco that they would work together on the Trifan property, with Trudeau doing all of the developing and investing all of the money and Respondent Runco doing all of the legal work in the development and sale of the property. Trudeau agreed that they would share the profits equally. Respondent Runco admitted there was an agreement, but claimed it was entered into after the sale of the Trifan's property on March 31, 1987. Even the disclosure of Respondent's interest in the sale after March 31, 1987, however, would give the appearance of impropriety.

. . . Mr. Trudeau testified more credibly in this regard. Unlike Respondent Runco, Mr. Trudeau had no apparent motive to provide false testimony. Memoranda was [sic] presented which indicated payments to Respondent Runco as a "finders fee." The Trifans received no information about this informal partnership before or after the sale. Respondent Runco, on several occasions, indicated to Trudeau that his financial interest in this property should not be disclosed to anyone. As a result, Trudeau did not disclose this to anyone except his wife, who was a partner in their development partnership known as VI Properties, and Joe Guido, a business associate. Trudeau and Respondent Runco obtained the zoning variance to permit the construction of an oil lube and muffler business on the Melvindale property before the purchase of the property.

Trudeau, on behalf of the Trudeau/Runco partnership, made an offer of $46,000, which was accepted by the Trifans and the deal was closed on March 31, 1987, the same day that the Trifans closed on the purchase of the Allen Park property. The deal was closed in Respondent Runco's office.

In November of 1987, Trudeau was "flabbergasted" when he received an offer for $133,000 for four of the seven lots as a site to build a Jiffy Lube. After negotiation, the property was sold for that amount. The transaction closed on January 19, 1988, and Trudeau and Respondent Runco shared the profits equally. Shortly thereafter, the remaining three lots were sold for $20,000. The two partners, again, shared the profits equally. Respondent Runco admitted on the witness stand that he received a total on the

3

two sales of $41,000 and deposited those sums in his brokerage account. At no time did Respondent Runco or Trudeau ever advise the Trifans of the secret partnership between them.

Respondent Runco's attorneys tried to introduce many irrelevant facts regarding Mrs. Runco's campaign for a State Senate seat. During this campaign, certain Dearborn businessmen had circulated derogatory statements about Mrs. Runco. Trudeau was never found to have participated in nor been responsible for any activity in this regard. This testimony, therefore, did not impeach Trudeau's credibility.

Near the end of its recommendation, the commission offered a concluding paragraph that well summarizes the misconduct involved in this case:

The Commission would further state that the Master, who heard the testimony and observed the witnesses, was in a better position to determine the credibility of the witnesses and that he rejected Respondent's version of the facts. However, even if Respondent's version of the facts were accepted as true, Respondent would still be guilty of professional misconduct. Respondent's actions, as an attorney, created a breach of his fiduciary duty to his clients, the Trifans. Further, Respondent's actions constituted a conflict of interest, or at least the appearance of same relative to his clients, the Trifans. This is not a situation where Respondent acquired information about his clients' property independently, after the fact, and subsequently acquired an interest in it pursuant to some business arrangement with an unrelated third party. Instead, Respondent acquired information from his clients while he was representing them; he introduced the purchaser to his clients and essentially brokered the deal. Without Respondent's involvement, there is no likelihood whatsoever that this transaction would have been consummated. Almost immediately thereafter, under Respondent's version, he became involved in a business relationship with his handpicked purchaser and acquired an interest in the property, which translated very quickly into a substantial profit. Given Respondent's role in the initial transaction, and the proximity in time between his representation of the Trifans and his business

4

arrangement involving the property, accepting his version of the sequence of events, he should have been put on notice that his actions constituted self-dealing or the appearance of self-dealing and monetary benefit at the expense of his clients.

The commission also found that Judge Runco committed judicial misconduct by failing to file a timely answer to the formal complaint:

> Respondent failed to file an answer to the Formal Complaint containing a full and fair disclosure of all facts and circumstances pertaining to the alleged misconduct, as required by MCR 9.209(A), and failed to comply with a Commission Order requiring that he "file and serve his answer to the Formal Complaint on or before the close of business on January 8, 1999," despite a warning from the Master that he would be in default if he failed to comply.[2]

Throughout the pendency of this matter, the parties have disputed whether this matter should be dismissed on the basis of laches, or some similar theory.[3] On this record, we are

---

[2] The formal complaint was filed on November 23, 1998. In response, Judge Runco filed on December 7, 1998, a document entitled "Answer to Complaint," but which specifically stated that "Respondent is not at this time filing an Answer to the Formal Complaint as contemplated by MCR 9.209." Instead, Judge Runco filed a complaint for mandamus under MCR 7.304(A), seeking to have this Court exercise superintending control over the Judicial Tenure Commission and dismiss the formal complaint in part on the basis of laches. As the commission noted in its opinion, Judge Runco also ignored a December 15, 1998, order directing him to file an answer.

Even assuming without deciding that the filing of the complaint for mandamus tolled the fourteen-day period in which Judge Runco's answer was due under MCR 9.209(A), Judge Runco still did not file an answer until July 26, 1999, more than two months after this Court dismissed his complaint and lifted the stay of proceedings that had been entered.

[3] In response to Judge Runco's complaint for superintending control, we directed the parties in March 1999 to brief "the questions whether (a) a formal complaint may be defended on a ground in the nature of a statute of

5

satisfied that, even if such a defense were available in this case (a question we do not decide), there would be no basis for its application here. As the commission observed, the heart of this dispute concerns the timing of the agreement between Judge Runco and Mr. Trudeau. Each testified at length, and we accept the commission's determination that the materials that had become unavailable over time did not include any that were necessary for resolution of the central issues.

The commission found that a public censure was an appropriate sanction in this case:[4]

> In considering what sanction to recommend to the Supreme Court, the Commission notes that Respondent committed the acts underlying Formal Complaint No. 61 over 12 years ago, when he was a fairly young, inexperienced attorney, and the book has yet to be closed as Respondent's former client has a pending civil action for money damages. Furthermore, there is no record of any disciplinary

---

limitations, (b) whether such a defense, if accepted, should be developed as a court rule, or as an application of laches or due process, or in some other manner, (c) whether such a defense, if accepted, should include a tolling or discovery provision, and (d) how such a defense, if accepted, pertains to the present case." 590 NW2d 288 (1999). After hearing oral argument, we entered an order that provided:

> Counsel for the Judicial Tenure Commission having represented at oral argument that, consistent with MCR 9.205(E), the commission must consider all circumstances, including equitable defenses, in deciding whether to take action, and further that the master is authorized to recommend dismissal at any time during the proceedings, the complaint for superintending control is dismissed. [459 Mich 1251 (1999).]

[4] Three members of the commission dissented in part, urging this Court to impose a thirty-day suspension without pay.

action against Respondent as a judge, a position he held for eight years prior to this proceeding.

We agree with the commission's finding that Judge Runco committed misconduct in violation of Const 1963, art 6, § 30, and MCR 9.205(E) by engaging in self-dealing contrary to the interests of his clients, and that Judge Runco's failure to file a timely answer to the formal complaint constitutes additional grounds for discipline. MCR 9.209(A). We further agree that a public censure is warranted. Accordingly, for these reasons, we publicly censure the Honorable William J. Runco, Judge of the 19th District Court. This written judgment will stand as our censure.

CORRIGAN, C.J., and WEAVER, KELLY, TAYLOR, YOUNG, and MARKMAN, JJ., concurred.

S T A T E  O F  M I C H I G A N

SUPREME COURT


IN re HONORABLE WILLIAM J. RUNCO,

No. 116565

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur with the findings of fact and conclusions of law in the per curiam opinion, but dissent from the sanction imposed. I would impose the sanction recommended by the dissenting opinion of the Judicial Tenure Commission, a thirty-day suspension without pay.